UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

CHLOE ALLEN and SANDRA
ALLEN as next friend of H.A,

      Plaintiffs,                          Judge Hala Y. Jarbou
                                           Magistrate Judge Maarten Vermaat
v                                           No. 23-00200

ESCANABA AREA PUBLIC SCHOOLS,

      Defendant.
_____/

| | |
|---|---|
| Matthew J. Clark (P76690) | Timothy J. Mullins (P28021) |
| Rachel N. Helton (P61885) | John L. Miller (P71913) |
| Gregory, Moore, Brooks & Clark, P.C. | Giarmarco, Mullins & Horton, P.C. |
| *Attorneys for Plaintiffs* | *Attorneys for Defendant* |
| 28 West Adams, Suite 300 | 101 W. Big Beaver Road, 10th Floor |
| Detroit, MI 48226-1613 | Troy, MI 48084-5280 |
| (313) 964-5600 | (248) 457-7188 |
| Matt@unionlaw.net | tmullins@gmhlaw.com |
| rachel@unionlaw.net | jmiller@gmhlaw.com |

**EXHIBIT B (REDACTED) TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT B

**Deposition of Sandra Rene Allen**
**August 14, 2024**

```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MICHIGAN
 2
     CHLOE ALLEN and SANDRA           )
 3   ALLEN as next friend of H.A.,    )
                                      )
 4            Plaintiffs,             )
                                      )
 5   v.                               )   Case No. 23-00200
                                      )
 6   ESCANABA AREA PUBLIC SCHOOLS,    )
                                      )
 7            Defendant.              )

 8                 DEPOSITION OF SANDRA RENE ALLEN

 9          Taken by the Defendant on the 14th day of August, 2024,

10          at the Courtyard Room of Escanaba Upper Elementary

11          School, 1500 Ludington Street, Escanaba, Michigan, at

12          10:55 a.m. (EST)

13   APPEARANCES:

14   For the Plaintiffs:        MR. MATTHEW J. CLARK (P76690)
                                GREGORY, MOORE, BROOKS & CLARK, P.C.
15                              28 West Adams, Suite 300
                                Detroit, MI 48226
16                              (313) 964-5600
                                matt@unionlaw.net
17
     For the Defendant:         MR. JOHN L. MILLER (P71913)
18                              GIARMARCO, MULLINS & HORTON, P.C.
                                101 W. Big Beaver Road, 10th Floor
19                              Troy, MI 48084
                                (248) 457-7188
20                              jmiller@gmhlaw.com

21   REPORTED BY:               Ms. Natalia Rutkowski, CSR #9088
                                Certified Shorthand Reporter
22                              Registered Professional Reporter
                                Rutkowski Court Reporting, LLC
23                              (906) 250-1462

24   ALSO PRESENT:              Ms. Chloe Allen
                                [REDACTED]
25                              Mr. Corey Allen
```

**Deposition of Sandra Rene Allen**
**August 14, 2024**

TABLE OF CONTENTS

WITNESS:                                                          PAGE

SANDRA RENE ALLEN

    Direct Examination by Mr. Miller                            3

    Cross-Examination by Mr. Clark                             39

    Redirect Examination by Mr. Miller                         40

    Further Redirect Examination by Mr. Miller                 41


EXHIBITS:

    None

| | | |
|---|---|---|
| 1 | | was vice president.  So it was just the next person, you |
| 2 | | know, that I would contact. |
| 3 | Q. | Gotcha.  And at that time, were all your interactions |
| 4 | | with him professional and -- |
| 5 | A. | Absolutely, yes. |
| 6 | Q. | All right.  And you thought he was competent with what he |
| 7 | | was doing? |
| 8 | A. | Yes. |
| 9 | Q. | And do you think he's a good coach? |
| 10 | | MR. CLARK:  Objection, calls for speculation. |
| 11 | | You can respond. |
| 12 | | THE WITNESS:  I have never -- Aside from the |
| 13 | | bantam year, that was the first year for ▮▮▮▮ that I've |
| 14 | | witnessed Andy coach.  As a person, I think he's a great |
| 15 | | person.  And I do think that there were some areas that |
| 16 | | he could have coached better or communicated better, but |
| 17 | | I wouldn't say that he's a bad coach, no. |
| 18 | BY MR. MILLER: | |
| 19 | Q. | Okay.  Some Facebook comments and replies were produced |
| 20 | | by your attorney, and some of your replies to that were |
| 21 | | suggesting -- I think one of them said, "First of all, |
| 22 | | no one has said he isn't a good coach." |
| 23 | A. | Correct. |
| 24 | Q. | And you still stand by that? |
| 25 | A. | Yep. |

| | | |
|---|---|---|
| 1 | | But if it was -- I would have taken her immediately if |
| 2 | | she had problems breathing or anything. |
| 3 | Q. | Okay.  And from your memory, was Chloe in school the next |
| 4 | | two days of the tryouts? |
| 5 | A. | I don't remember. |
| 6 | Q. | Okay.  Would it surprise you if attendance records showed |
| 7 | | that she was at school? |
| 8 | A. | I can't confirm.  I don't know.  I mean, I wouldn't be |
| 9 | | surprised if she was there, but I also wouldn't be |
| 10 | | surprised if she wasn't.  It was a long time ago. |
| 11 | Q. | Okay.  And do you remember her having an eye appointment? |
| 12 | A. | Yes. |
| 13 | Q. | Okay.  Did you take her to the eye appointment? |
| 14 | A. | I did not.  I was not always in charge of the eye |
| 15 | | appointments.  Typically, Corey would handle eye |
| 16 | | appointments. |
| 17 | Q. | All right.  And ultimately, though, you ended up calling |
| 18 | | the superintendent.  It was December 2nd, 2022.  Does |
| 19 | | that sound right? |
| 20 | A. | Yes. |
| 21 | Q. | All right.  By chance, did you record that conversation? |
| 22 | A. | I did not record that conversation. |
| 23 | Q. | Did you take any notes of the conversation as it was |
| 24 | | occurring? |
| 25 | A. | Not notes as it was occurring.  Just the date and time |

```
1    A.   Oh, yes.
2    Q.   And then some?
3    A.   And then some, yes.
4    Q.   All right.  Did you play hockey yourself?
5    A.   No.
6    Q.   All right.  Did Corey play hockey?
7    A.   Corey did, yes.
8    Q.   And where did Corey play hockey?
9    A.   Escanaba.
10   Q.   Did he grow up in Escanaba?
11   A.   He grew up in Perkins.
12   Q.   All right.  I asked a couple more slightly specific
13        questions.  But are you aware of the police ever being
14        called on your husband?
15   A.   During sports or just in general?
16   Q.   Just in general.
17   A.   Once.
18   Q.   All right.  And when was that?
19   A.   That was during COVID.  2020, I believe.
20   Q.   Okay.  And what happened then?
21   A.   We were at Menards, and he was asked to pull up his mask,
22        and he got argumentative, and he ended up walking out of
23        the store, to which the police were in the parking lot.
24   Q.   Because someone had called them?
25   A.   Yes.
```

**Deposition of Sandra Rene Allen**
**August 14, 2024**

```
1    Q.   So this interaction went on for quite a while?
2    A.   It didn't last very long.  I would say maybe ten minutes.
3    Q.   All right.  And I'm guessing it wasn't an overly
4         enjoyable moment for yourself?
5    A.   No.
6    Q.   All right.  And no other police interaction that you can
7         recall with your husband?
8    A.   No.
9    Q.   All right.  Have you, yourself, ever been arrested?
10   A.   No.
11   Q.   All right.  Have you ever been a party to a lawsuit?
12   A.   Yes.
13   Q.   Okay.  Besides your role in this?
14   A.   Yes.
15   Q.   Okay.  What was that?
16   A.   I was in a fender-bender in Wisconsin, and the driver of
17        the motorcycle sued.
18   Q.   Were you the at-fault vehicle?
19   A.   Yes.
20   Q.   All right.  And how did that end up resolving?
21   A.   He won in court.  They settled out of court.
22   Q.   Okay.  So there was a settlement?
23   A.   Yeah.
24   Q.   It didn't go to jury trial or anything?
25   A.   It didn't go to a jury trial.  We just -- The only thing
```

1               I can remember is going to a deposition, and then that
2               was pretty much it.
3       Q.      Okay.  And you had insurance that covered it?
4       A.      Yep.
5       Q.      All right.  Any other lawsuits?
6       A.      Nope.
7       Q.      Besides the divorce proceeding?
8       A.      That would be it, yes.
9       Q.      Okay.  Did you get to the discovery stage in that, where
10              there were depositions?
11                      MR. CLARK:  Objection, calls for a legal
12              conclusion.
13                      You can respond.
14                      THE WITNESS:  I don't remember.  It was a long
15              time ago.
16      BY MR. MILLER:
17      Q.      Well, it was about a year ago.
18      A.      Oh, you're talking about for the divorce?
19      Q.      Yes.
20      A.      Okay.  So the divorce, we handled -- We didn't have
21              depositions.  We went to -- It was all agreed upon.  We
22              went and met with the Friend of the Court to do the
23              meeting -- I don't know what they really call it -- just
24              to agree on terms of custody.
25      Q.      Okay.  Did you have an attorney?

```
1    A.   Nope.
2    Q.   Okay.  Were there any complicated pension matters at all?
3    A.   Nope.  Nope.
4    Q.   Does Corey have a pension?
5    A.   He does, yes, I believe.
6    Q.   Was any of the pension allocated towards you in the
7         divorce?
8    A.   No, I did not -- I said "no" to everything.
9    Q.   Okay.  Is there a reason you wouldn't have wanted a
10        portion of the pension?
11   A.   I just wanted to get out of the marriage and be done with
12        it, so I just said "no" to all of it.
13   Q.   Were there ever issues of spousal abuse?
14   A.   Verbal, yes.
15   Q.   What about towards the kids?
16   A.   He would raise his voice, but not outside of any normal
17        dad.
18   Q.   Okay.  Were there ever incidents at hockey games of Corey
19        yelling at his son, calling him an idiot?
20   A.   I don't recall seeing or hearing that, no.
21   Q.   All right.  Are you aware that the softball team is not
22        allowed to go to a certain tournament anymore because of
23        Corey?
24   A.   No.
25   Q.   Are you saying that that's untrue, or you just don't
```

| | | |
|---|---|---|
| 1 | A. | Yep. |
| 2 | Q. | That was about it? |
| 3 | A. | Yep. |
| 4 | Q. | But what did you say? |
| 5 | A. | Initially, when I contacted Coby Fletcher, it was out |
| 6 | | of -- you know, I wanted to ask questions regarding |
| 7 | | policies and procedures, and to kind of get his feedback |
| 8 | | on why.  In that conversation, he was very in agreeance |
| 9 | | with me, as he has daughters himself, and he made it |
| 10 | | sound as though he would have done the same thing that I |
| 11 | | was doing in asking questions and wanting to know what |
| 12 | | was going on. |
| 13 | Q. | All right.  And like you said, nice guy, and he seemed |
| 14 | | empathetic and understanding? |
| 15 | A. | Mm-hmm. |
| 16 | Q. | Yes? |
| 17 | A. | Yep.  Yes. |
| 18 | Q. | All right.  Did you get the impression he took your |
| 19 | | concern seriously? |
| 20 | A. | Yeah.  Yes. |
| 21 | Q. | All right.  And was anything else said during that |
| 22 | | conversation? |
| 23 | A. | No.  He said he would get back to me.  He would look into |
| 24 | | it more, contact Mr. Wilson and Andy Johnson, and he |
| 25 | | would get back to me.  Which, he was very responsive. |

1   Q.   Okay.  When he got back to you next, was it by phone call
2        or was it by e-mail?
3   A.   I believe it was by e-mail initially, and then he
4        followed up with a phone call.
5   Q.   Okay.  And what was that conversation?
6   A.   That -- I don't remember word for word how it went.  But
7        that they didn't find initially anything wrong with it,
8        but then if I wanted to pursue it, they would do an
9        investigation.  And I said, "Yes, I want to pursue this."
10  Q.   Okay.  And do you know when that was?
11  A.   Not offhand.  I don't have exact dates.
12  Q.   Was that by e-mail or was that by phone?
13  A.   It was by e-mail, I believe.
14  Q.   Okay.  And prior to that December 2nd, 2022 phone call
15       with Superintendent Fletcher, had you made any complaints
16       regarding sex discrimination to him?
17  A.   To Coby Fletcher?  No.
18  Q.   To anyone else besides Coby Fletcher?
19  A.   No.
20  Q.   All right.  And besides e-mails, which we have already,
21       did you have any more in-person conversations or phone
22       calls with Coby Fletcher?
23  A.   No, no.  Mainly after -- Once the investigation started,
24       I think it was all primarily through e-mail.
25  Q.   Okay.  Do you have any recorded conversations with

| | | |
|---|---|---|
| 1 | | Superintendent Fletcher? |
| 2 | A. | No. |
| 3 | Q. | All right.  Do you have any recorded conversations with |
| 4 | | anyone relating to this lawsuit? |
| 5 | A. | No. |
| 6 | Q. | Okay.  And to some extent, I mean, with the lawsuit being |
| 7 | | filed in public, has there been -- how has it been |
| 8 | | received by the community, to the extent that you know? |
| 9 | | Has there been conversations with you about it? |
| 10 | A. | I can say that initially, right when this all first |
| 11 | | happened, I was deleted, blocked, you know, by the |
| 12 | | parents.  I witnessed Andy Johnson and his wife, Sarah |
| 13 | | Johnson, talking amongst these parents at one of the |
| 14 | | games, and they all kept looking over at me, and then |
| 15 | | slowly, they all started to delete and block me.  And we |
| 16 | | have been friends since our kids were three years old. |
| 17 | Q. | May I interrupt real quick?  What do you mean by |
| 18 | | "deleted" and "blocked"? |
| 19 | A. | On Facebook and social media. |
| 20 | Q. | Okay. |
| 21 | A. | And they have yet -- They have not talked to me since. |
| 22 | Q. | Okay.  So these are parents in the community -- |
| 23 | A. | Yes. |
| 24 | Q. | -- that blocked you on Facebook? |
| 25 | A. | Yep. |

```
1   Q.   All right.  Did you hear this conversation at all that --
2   A.   I did not hear it, no.
3   Q.   All right.  So it's fair to say you have no idea what was
4        said?
5   A.   Correct.
6   Q.   All right.  So if people have learned about this in the
7        community, do you have any personal knowledge yourself
8        how they learned of it?
9   A.   No.
10  Q.   And after filing this lawsuit, [REDACTED] tried out his
11       sophomore year and made the team, correct?
12  A.   Correct.
13  Q.   Then wouldn't you agree the coaching staff has treated
14       him the same as other students on the team?
15              MR. CLARK:  Objection, calls for speculation.
16              You can respond.
17              THE WITNESS:  I would say for the most part,
18       he's treated fairly, yes.
19  BY MR. MILLER:
20  Q.   All right.  If Andy's goal was to retaliate against
21       [REDACTED] for you making a complaint, do you have any idea
22       why he would have put him on the team his sophomore year?
23              MR. CLARK:  Objection, calls for speculation.
24              You can respond.
25              THE WITNESS:  Can you rephrase that?  Sorry.
```

```
1    Q.   Okay.  And where do they live?
2    A.   They live in Gladstone.
3    Q.   Gladstone?
4    A.   Yep.
5    Q.   All right.  Did you have a relationship with him at all?
6    A.   Our kids have played.  We've known them since the girls
7         were very small.
8    Q.   Okay.  And his response was essentially, "Andy's always
9         been supportive of Libby, and we want to stay out of
10        this"?
11   A.   Correct.
12   Q.   And do you have any reason to doubt that Coach was always
13        fair with Libby?
14   A.   I have no reason to doubt that at all.  Andy did coach
15        Libby.
16   Q.   Okay.  And then either prior to or after the
17        December 2nd, 2022 verbal complaint to Dr. Fletcher,
18        did you make any other complaints during Chloe's time in
19        high school about sex discrimination?
20   A.   No.
21   Q.   Okay.  Did you make any complaints regarding ▮▮▮▮ at
22        all?
23   A.   No.
24   Q.   And you'd agree that the School District did investigate
25        your complaint, but you disagreed with the outcome?
```

1   A.   Correct.  Yes.
2   Q.   All right.  And did you learn that ▮▮▮▮ didn't make the
3        team his freshman year at the end of tryouts?
4   A.   Correct.  Yes.
5   Q.   All right.  And did he come home and say something, or --
6   A.   He came home pretty upset.  I think any kid in his
7        position would have taken that pretty hard.  And I sat
8        with him and, you know, we just talked about it, tried to
9        talk through it.  You know, I said, "It's okay, you're
10       not going to make every team that you ever try out for,"
11       and just was there as, you know, a support.
12  Q.   All right.  Are you aware that prior to that tryout, the
13       coach spoke with Corey saying that it would be better for
14       him to stay in the house league so he gets more playing
15       time that year?
16  A.   After the fact, I was told that.
17  Q.   Okay.  By who?  Corey?
18  A.   Corey.
19  Q.   All right.  And having lived in the community for an
20       awfully long time, are you friends with any of the
21       current board members, or --
22  A.   I wouldn't say friends.  Acquaintances, but not friends.
23  Q.   Okay.  Who would you like kind of raise to the -- I mean,
24       I guess I kind of like -- Stranger, someone I see in the
25       grocery store, acquaintance, friend ...