UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHLOE ALLEN, et al.,

      Plaintiffs,

                               Case No. 2:23-cv-200

v.

                               Hon. Hala Y. Jarbou

ESCANABA AREA PUBLIC SCHOOLS,
et al.,

      Defendants.

_____/

## OPINION

In this Title IX suit, Chole Allen alleges she was denied a fair opportunity to try out for her high school's varsity team because of her sex, and that the school later retaliated against her for complaining about that disparate treatment and the bullying the male hockey players subjected her to.  The school district now moves for summary judgment (ECF No. 17), arguing that the only reason Allen did not make the team is that she was not skilled enough to play hockey at the varsity level.  Because neither Allen's equal-treatment claim nor her retaliation claim succeeds, the motion is granted as to those claims.  The Court also grants summary judgment on the remaining claims raised by Allen and her brother H.A. because those claims were abandoned in their opposition brief and as a result are no longer subject to legitimate factual dispute.

## BACKGROUND

### I.      Athletics at the Escanaba Area Public Schools

Escanaba is a small city on the southern coast of Michigan's Upper Peninsula.  Defendant in this case, the Escanaba Area Public Schools, directs the education of the approximately 2,200 students who reside in the district, including the cultivation of their athletic abilities by sponsoring

interscholastic teams.  Escanaba Area Public Schools offer a wide range of sports for students to participate in; at the high-school level, these include mainstays such as football, baseball, basketball, and hockey.

Because Escanaba's pool of varsity-level talent is shallow owing to its rural character, the hockey team also takes on members who attend high school in neighboring Gladstone.  (Johnson Dep. 70, ECF Nos. 17-5, 23-6.)  The team size has fluctuated between fifteen and nineteen players since the 2019–2020 season.  (ECF No. 10 at 16–24.)[1]  At the beginning of the 2022–2023 season, when Allen tried out, the final number of members selected for the team was seventeen.  (*Id.* at 22.)  The only person cut from the team that year was Allen's brother H.A.  (H.A. Dep. 9–10, ECF No. 17-2.)[2]  The school's athletic director during that academic year, David Wilson, explained that the cut policy was attributable to the relatively small number of players on the ice (five for each side) during normal hockey play.  (Wilson Dep. 13, ECF No. 17-10.)[3]  The number of people who do not make the team in a given year fluctuates; in the '23–'24 season, for instance, three players did not make the team.  (Johnson Dep. 39.)

Tryouts for the hockey team are usually held in late October or early November.  Andrew Johnson, who has been the hockey coach since 2021, holds a three-day tryout during that October–November window.  (*Id.* at 11, 30.)  When prospective members cannot attend the regularly scheduled tryout because they are on the football team and the team has made it into the postseason,

---

[1] According to the rules set out by the Michigan High School Athletic Association (MHSAA), at most 23 players are permitted on a varsity hockey team, a maximum of three of which may be goaltenders.  (ECF No. 23-10 at 2.)

[2] Because H.A. is a minor, he is referred to using his initials throughout.  As noted above, H.A. dropped all his claims during the pendency of this motion.

[3] Wilson is no longer the athletic director, but because he occupied that position during the period pertinent to this case he will be referred to that way throughout this Opinion.

another tryout for those players is scheduled.  (*Id.* at 31–32.)  According to Johnson, no makeup tryouts have been offered in the past for other reasons.  (*See id.* at 31.)

Two other positions are available to students who want to be part of the hockey team but are not skilled enough to play (or interested in playing): practice players and student managers. (Wilson Dep. 28–29; Johnson Dep. 38, 46.)  Decisions about both positions are in the hands of the head coach.  Johnson testified that his primary consideration in taking on a practice player is whether he can "mold" the player to be beneficial to the team in future seasons.  (Johnson Dep. 79–80.)  How many practice players the team had fluctuated by year.  In the 2021–2021 season, everyone who tried out for the team appears to have been selected, and as a result the team had no practice players.  (*Id.* at 48–49)  During the 2022–2023 season, by contrast, the team had one practice player; the following season, he was a full team member.  (*Id.* at 38.)  The reasons students are chosen as managers are less clear, but association with team members appears to be one factor. (*Id.* at 55.)  The hockey team has "typically" had at least one student manager in recent years.  (*Id.* at 46.)

Although the hockey team is often referred to as the "boys' hockey team" in public documents[4] and by the parties (ECF No. 23-12 ¶¶ 1–4; ECF No. 23-17 at 2), at least two girls made it onto the team in the last two decades.  The first girl, who graduated in 2007, played defense (ECF No. 23-5 at PageID.391); the second girl, who graduated in 2013, played goalie (Johnson Dep. 108).  As a volunteer coach, Johnson helped train the second girl.  (*Id.*)  Girls have played on other boys' teams at Escanaba: the wrestling team has had between one to five girls on it for at

---

[4]    *See* Escanaba HS Varsity Boys Ice Hockey, Michigan High School Athletics Association, https://www.mhsaa.com/schools/escanaba/boys/varsity/ice-hockey/2025 [perma.cc/SXP6-RS53].

least the last four years (Wilson Dep. 23), while one girl has played football for Escanaba schools up to the varsity team (*Id.* at 12).

## II.     Chloe Allen's Hockey Career Before and After 2022

Allen has played hockey since childhood.  (ECF No. 24-5 at 11.)  She was on a co-ed checking recreational team for at least one year before aging out (Johnson Dep. 64); she then played for girls' teams elsewhere in Michigan (ECF No. 24-5 at 11).  Some combination of school difficulties (ECF No. 23-13 at PageID.504) and COVID restrictions (Allen Dep. 26, ECF No. 23-2) prevented Allen from being able to play hockey her junior year of high school.  Allen decided to try out for the Escanaba boys' team her senior year because rosters for other teams in the area were full and she wanted to keep her skills sharp to play hockey in college (ECF No. 23-13 at PageID.504).   After Allen was cut from the Escanaba team, she played for Traverse City's nineteen-and-under girls' team.   (Allen Dep. 23.)   Since graduating high school, she has participated in club hockey teams during her freshman (Allen Dep. 21–22; Gorsuch Decl. ¶ 11, ECF No. 23-16) and sophomore years.[5]

Whether Allen was skilled enough to play on a varsity boys' hockey team during her last year of high school is disputed.  According to the school district's expert, few girls play on boys' varsity hockey teams in Michigan because varsity hockey is the first skill tier at which players are permitted (or encouraged) to check each other (ECF No. 23-17 at 4-5; *see* Pascarelli Dep. 17–18, ECF No. 23-18).  Girls who join varsity teams tend to occupy the goalie position.  (ECF No. 23-

---

[5] EAPS represents that Allen failed to disclose her current coach, Ryan Thierry, as a potential declarant before attaching his declaration as an exhibit to her opposition brief.  (Def.'s Reply Br. 15–16, ECF No. 24.)  Because Allen did not contest that argument, the Court finds that Thierry's declaration was not disclosed.  In consequence, the "automatic sanction" of exclusion is effective.  Fed. R. Civ. P. 37(c) advisory committee's note to 1993 amendment.

17 at 3.)[6]  The increasing availability of girls' hockey teams may also depress interest.  (Pascarelli Dep. 18.)

Whatever the cause of the disparity in general, Allen does not appear to have been an exceptionally talented hockey player.  Allen's coach when she played for a co-ed checking team said she was in the "lower tier" of players and would not have been a competitive player on a boys' varsity team.  (Martineau Decl. ¶¶ 8–9, ECF No. 17-7.)  Her coach during her senior year when she played for a girls' recreational team put her as the third most talented member of the team (Pascarelli Dep. 15), but by Allen's own admission and that of her teammate Kadence Gorsuch, that team was less "competitive" and most of the players were "younger and less skilled" than the two college-bound seniors.  (Pls.' Resp. in Opp'n 12, ECF No. 23; Gorsuch Decl. ¶ 9.)  Her coach at Lake Superior State University, who was in a position to assess Allen's skills before she suffered a season-ending injury her freshman year, said Allen could not play hockey "at a high level." (Parker Decl. ¶ 4, ECF No. 17-6.)

## III.    The Hockey Tryout and Its Aftermath

The broad outlines of Allen's attempt to try out for the Escanaba varsity team are not in dispute.  On October 31, 2022, Coach Johnson began holding a preannounced tryout scheduled to last three days.  (Johnson Dep. 30.)  Participants were expected to attend all three days.  (*Id.* at 67.) Allen came to the first day but left after only a few warmup drills because she was ill.  (*Id.* at 67– 68.)  Allen testified that she vomited in the locker room (Allen Dep. 44).  Allen did not attend the remaining two days of the tryout, and she introduced evidence showing she was absent from school those days (*see id.* at 45; ECF No. 23-7 at 3 (Allen's statement to school investigation); ECF No. 23-8 at 3–4 (attendance log noting Allen's absence from school on November 1 and 2)).

---

[6] Johnson pointed out during his deposition that checking the goalie is prohibited in hockey.  (Johnson Dep. 15.)

On the morning of November 2, the last day of tryouts, Allen emailed Johnson's supervisor, EAPS athletic director David Wilson, to inform him why she wan unable to try out for the hockey team and request a makeup tryout.  (ECF No. 23-9 at 2.)  Because Allen was not in school that day, she and Wilson set up a meeting for the following day to discuss her request.  What exactly happened during that meeting is contested: Wilson says he merely encouraged Allen to speak with Johnson directly (Wilson Dep. 43–44) but also says he spoke to Johnson about setting a makeup date and that he agreed (*Id.* at 48).

The parties contest whether a firm date had been set for that tryout.  Johnson appears to have believed that the makeup had been scheduled for Monday's team practice.  (*See* Johnson Dep. 68–69.)  If that was so, Allen did not get the message; she testified she could not attend practice that day because she was still sick.  (Allen Dep. 46.)  Allen stated during her interview in connection with the school's internal investigation that Wilson was not at the school on Monday (ECF No. 23-7 at 3), although Wilson denied that was the case (Wilson Dep. 49).  Another reason catalogued in the record is that Allen had to pick up contact lenses (ECF No. 27-3 at 3; Johnson Dep. 69), but Allen later testified that would have only made her late to practice (Allen Dep. 46).

Allen texted Johnson on Monday evening seeking to set up the tryout, apparently unaware that her presence had been expected at hockey practice that day.  (ECF No. 23-13 at 2.)  Allen's text message to Johnson requesting the makeup tryout contains two other salient points.  First, Allen asked whether it would be worth it for her to try out again: she worried that if she tried out and failed she would be bullied by the male hockey players.  (*Id.* at 3.)  Allen described being excluded from hockey by boys and expressed the hope that she could be an inspiration for other girls seeking to play ice hockey at a competitive level.  (*Id.*)  Second, Allen said that she was willing to be a student manager on the team if she could not play on it.  (*Id.* at 4.)

Johnson, Wilson, and Allen met to discuss the makeup tryout the next day, November 8. During the meeting, Johnson told Allen that she "was not what he envisioned" for the hockey team (ECF No. 23-7 at 11) and refused to allow Allen to try out (Wilson Dep. 49–51).  Johnson stated that he thought Allen was too small to play varsity hockey (Johnson Dep. 80) even though other members of the team, including Johnson's son, were around as tall as Allen's five feet and six inches (*Id.* at 81–82).  Johnson clarified during his deposition that "too small" referred not to height but weight and strength: his assessment was that Allen did not have the bodily resilience to be checked by a seasoned varsity player.  (*Id.* at 81, 83.)  Johnson also pointed out that he had seen Allen play when she was on the local fourteen-and-under recreational team (*id.* at 57), during preseason "open skates" at the hockey rink (*Id.* at 58), and for the first ten minutes of the regularly scheduled tryouts (*id.* at 65).  Johnson felt these observations were sufficient to form an opinion about Allen's hockey skills, which he rated as modest.  (*Id.* at 65, 79.)  Johnson denied Allen's gender had anything to do with his decision.  (*Id.* at 83.)[7]

Allen asked if she could be a practice player or student manager instead but was denied those opportunities too.  (*Id.* at 79; Allen Dep. 62.)  Johnson later testified that he did not want Allen as a practice player because she would not have been a benefit to the team given her "low" skill level and her impending graduation.  (Johnson Dep. 79–81.)  He also said he only wanted one student manager that year to avoid having the managers "goof off" instead of minding their responsibilities.  (*Id.* at 78.)

Allen was upset by the blanket refusal to let her join the team.  She was especially worried that a gap in her playing career during her senior year would jeopardize her chances of being able

---

[7] Johnson was goalie coach for one of the two female students who played varsity hockey for Escanaba.  (Johnson Dep. 108.)

to play hockey in college.  At some point after the November 8 meeting, Allen asked Wilson if she could participate in the hockey team's "Senior Night," during which each graduating player is celebrated for their accomplishments.  (Wilson Dep. 51; Johnson Dep. 88–89.)  Wilson referred the request to Johnson, who denied it on the grounds that Allen was not a member of the hockey team.  (Johnson Dep. 89–90.)

On December 2, Allen's mother Sandra, aggrieved by her daughter's total exclusion from the hockey team and her younger son H.A. being cut, lodged a complaint of sex discrimination with the school district's superintendent.  (S. Allen Dep. 12, ECF No. 17-3.)  The superintendent, Coby Fletcher, immediately hired an outside firm to investigate the complaint.  (ECF No. 23-7 at 2.)  Over the next month, the firm conducted interviews with Allen, her brother H.A., Wilson, Fletcher, a friend of Allen's, and Johnson.  (*Id.*)  On January 17, 2024, the firm reported to EAPS's board of education that it did not believe that any of the school district's antidiscrimination policies had been violated.  (*Id.* at 13.)  However, the investigation uncovered a "culture of hostility or lack of acceptance towards female hockey players" on the hockey team.  (*Id.*)  The firm recommended that the hockey players and coaching staff receive additional training on bullying and harassment. (*Id.*)  No training specific to sex discrimination was ever administered to the players or coaching staff.  (Johnson Dep. 97–98.)

Allen graduated at the end of the 2022–2023 academic year and now attends Northern Michigan University.  (Allen Dep. 23.)  H.A., who still attends Escanaba High School, now plays on the varsity hockey team.  (H.A. Dep. 10.)

IV.    **Procedural History**

This suit was instituted on October 24, 2023, by Allen and her mother, who was acting as next friend for H.A.  (ECF No. 1 at 1.)  The complaint raised claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and the Elliott-Larsen Civil Rights Act, Mich. Comp.

Laws § 37.2402, for disparate treatment of and retaliation against Allen and H.A. (the first, second, fifth, and sixth counts); 42 U.S.C. § 1983 for deprivations of the equal protection and due process guaranteed by the Fourteenth Amendment (the third and fourth counts); and Michigan's freedom-of-information statute, Mich. Comp. Laws § 15.240, for unlawful withholding of portions of the school district's investigation into Sandra Allen's original complaint (the seventh count).  EAPS timely answered the complaint.  (ECF No. 4.)  It now moves for summary judgment (ECF No. 17), which Allen opposes (ECF No. 23).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the movant would not bear the burden of persuading the finder of fact of its claim or defense at trial, the necessary showing can be made by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim," *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting), or by "pointing out" that there is no evidence supporting such an element, *id.* at 325 (majority opinion).  The onus is then on the nonmovant to come forward with "'sufficient evidence from which a jury could reasonably find' in its favor."  *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (quoting *Troutman v. Louisville Metro. Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020)).  All inferences from disputed facts must be resolved in the nonmovant's favor.  *Doe v. Univ. of Ky.*, 111 F.4th 705, 715 (6th Cir. 2024).

## ANALYSIS

The Court first sets out the Title IX regime that governs Allen's core claims.  Decisive among the elements of that regime is the exemption in Title IX's implementing regulations that allows covered institutions to exclude girls and women from boys' contact-sport teams.  Because the record does not establish beyond dispute that the varsity hockey team at Escanaba High School

is for boys only as a matter of policy, the Court finds that Defendant is not entitled to the benefit of the exemption at summary judgment.

Proceeding on the assumption that this antecedent issue is resolved in Allen's favor, the Court then identifies from among the competing frameworks proposed by the parties for adjudicating Title IX suits the one most congruent to the claim of individual discrimination that Allen raises.  Applying a modified version of the familiar *McDonnell Douglas* burden-shifting test applied in Title VII cases, the Court finds that Allen has not presented evidence sufficient to permit a finding of discrimination because the discriminatory conduct she cites was all committed by athletic staff and not the school district proper.

The Court also finds that EAPS is entitled to summary judgment on Allen's retaliation claim.  Allen never reported being bullied either to the school district's responsible officials or to the athletic staff.  And if her mother's complaint to the school district about the denial of a tryout was a protected activity, Allen cannot point to any adverse action taken against her in response to that complaint.

The Court concludes by evaluating Allen and H.A.'s putative dismissal of a large chunk of their claims in their opposition to EAPS's motion.  The Court treats these claims as having been abandoned and that summary disposition of them is warranted.  Consequently, EAPS's motion is granted in full.

## I.    Title IX and the Contact-Sports Exception

### A.    The Title IX Regime

Congress enacted as Title IX to the Education Amendments of 1972 a wide-ranging prohibition on sex discrimination in educational institutions receiving federal funding.  Pub. L. No. 92-318, 86 Stat. 235, 373–75 (codified as amended at 20 U.S.C. §§ 1681–1686); *South Carolina v. Metro. Gov't of Nashville*, 86 F.4th 707 (6th Cir. 2023).  The statute is an exercise of

Congress's power under the Spending Clause, Art. I, § 8, cl. 1, to impose restrictions "in the nature of contract" on how recipients of federal funds can use them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

Enforcement of Title IX's guarantee of equality between the sexes at school is entrusted in the first instance to the Department of Education. 20 U.S.C. § 3441(a)(3); *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998) (describing Title IX's "express means of enforcement" as that "by administrative agencies"); *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993). Not long after Title IX was passed, Congress directed the Department of Education's predecessor agency, the Department of Health, Education, and Welfare (HEW), to promulgate regulations on sex discrimination in intercollegiate sports. Javits Amendment, Pub. L. No. 93-380, sec. 844, 88 Stat. 484, 612 (1974) (codified as amended at 20 U.S.C. § 1681 note). HEW's athletics regulations, which were reissued by the Department of Education in 1980 and remain in effect today, establish an antidiscrimination framework without close parallel in civil rights law: educational institutions that offer athletic opportunities are prohibited from offering those opportunities on an unequal basis, but they are expressly permitted to "operate or sponsor separate teams for members of each sex where selection . . . is based upon competitive skill" or, especially pertinent here, "the activity involved is a contact sport." 34 C.F.R. § 106.41(a) (2024).

Two guidance documents issued by the enforcing agencies, one by HEW in 1979[8] and the other by the Department of Education in 1996,[9] explicate what "equal athletic opportunities" are.

---

[8] Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71413 (Dec. 11, 1979).

[9] U.S. Dep't of Educ., Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996) [hereinafter 1996 Clarification], *reprinted in* U.S. Comm'n on C.R., Title IX Athletics: Accommodating Interests and Abilities 114 app. C (2010), https://www.usccr.gov/files/pubs/docs/TitleIX-2010-rev100610.pdf [perma.cc/4XZY-22QV].

The standards set out in both documents uncontroversially apply to primary and secondary schools as well. *See Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 273 (6th Cir. 1994).

In addition to enforcement by the Department of Education, Title IX's ban on sex discrimination has been held to contain an implied right of action for private suits, by analogy to the right of action found in the similarly worded prohibition on racial discrimination in Title VI of the 1964 Civil Rights Act. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 696 & n.18 (1979). The responsibility for "defin[ing] the contours" of the Title IX implied right of action belongs to the courts that created it. *Cf. Musick, Peeler & Garrett v. Emps. Ins. of Wausau*, 508 U.S. 286, 293 (1993) (applying the same principle to judicial elaboration of the securities laws).

Although an implied right of action cannot be invoked to enforce implementing regulations that prohibit conduct that the organic statute does not restrict, *see Alexander v. Sandoval*, 532 U.S. 275, 293 (2001), regulations can inform construction of what the statute does prohibit, *id.* at 284–85. This is especially warranted for regulations enacted pursuant to express congressional directive and of longstanding provenance. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2283 (2024) (Gorsuch, J., concurring); *see also McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 290 (2d Cir. 2004) (declining to decide whether to defer to the 1979 interpretation under the then-operative *Chevron* doctrine or according to the currently controlling *Skidmore* standard because it is "both persuasive and not unreasonable").[10]

---

[10] *Sandoval* arguably is not controlling, notwithstanding its recognition that the regulations promulgated to interpret Title VI of the Civil Rights Act are pertinent to enforcement of Title VI through a private right of action. After *Loper Bright*, it can no longer be said that Congress's imputed intent to see statutes enforced through private rights of action implies that Congress also wants the regulations interpreting those statutes to be enforced too, as an agency's valid and reasonable construction is no longer "authoritative." *Sandoval*, 532 U.S. at 284.

B.    The Contact-Sports Exception

As alluded to earlier, a regulatory provision with a decisive influence on this case is the so-called "contact sports exception," which permits—but does not obligate, *see Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981)—funding recipients to categorically exclude members of one sex from a sports team for the other sex if the sport's "purpose or major activity . . . involves bodily contact."  34 C.F.R. § 106.41(b).  Since hockey is explicitly listed as an example of a contact sport in the regulation, and since there is no dispute that the Escanaba hockey team plays checking hockey with frequent and sometimes very forceful collisions between players, the contact-sports exception is dispositive of Allen's Title IX claims unless she can establish that there is a genuine dispute over whether the hockey team is exclusively a boys' team.

There seems to be little case law on how the sex-segregated status of a school team should be determined.  But while that question has an easy answer in most circumstances (are there both males and females on the team?), the defendant school district here has permitted at least two female students to try out and join its ostensibly boys-only hockey team in the past.  The school district implicitly argues that it should not be bound by its past conduct (Mot. 21), while Allen relies on *Mercer v. Duke University*, 190 F.3d 643 (4th Cir. 1999), to support the position that it must be.  According to *Mercer*, "[o]nce an institution has allowed a member of one sex to try out for a team operated by the institution for the other sex in a contact sport, [section 106.41(b)] is simply no longer applicable, and the institution is subject to the general anti-discrimination provision of subsection (a)."

Allen reads *Mercer* for more than it is worth.  In *Mercer*, the plaintiff not only tried out as a walk-on football kicker but joined the team for an entire season before being kicked off for allegedly sexist reasons.  *Id.* at 644–45.  *Mercer*'s precise holding is that an allegation of

13

discrimination by a female athlete permitted to join a contact-sport team states a valid Title IX claim.  *Mercer* does not say that the team, after it has allowed one female student athlete to join it, must henceforth allow both sexes to try out.  Further lessening the force of *Mercer* is contrary authority stating that a member of one sex can be "excluded" from a contact-sport team for the other sex even after being permitted to try out and placed on a team.  *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 172, 174 (3d Cir. 1993), *cert. denied*, 510 U.S. 1043 (1994); *see also Lantz ex rel. Lantz v. Ambach*, 620 F. Supp. 663, 665 (S.D.N.Y. 1985) (finding that the Title IX regulations "do not apply to contact sports such as football").

While *Mercer* alone does not decide the issue, Allen may still be able to evade the contact-sport exception if she can establish that the hockey team is integrated by sex pursuant to a settled policy.  If the school district has a policy of allowing girls to try out for all contact-sports teams for boys, it is not implausible that it depart from ad hoc departures from that policy.  *See Gordon v. Jordan Sch. Dist.*, 522 F. Supp. 3d 1060, 1092 n.8 (D. Utah 2021), *aff'd*, No. 21-4044, 2023 WL 34105 (10th Cir. Jan. 4, 2023).  Resolving that knotty question is not necessary for the moment because Allen has created enough of a fact issue about whether the school district actually "operates or sponsors a team" for one sex.  There is some evidence suggesting the hockey team is still a boys' team: the team is almost always exclusively composed of boys, people in the community (including the parties) often refer to it as a boys' team (Mot. 6; Resp. 7, 12, 21, 24, 26), and the high school's athletic handbook refers to ice hockey as a sport for "boys."[11]

On the other hand, there is also evidence that the hockey team is integrated by sex as a matter of policy.  The MHSAA handbook with which the school district's athletics program at

---

[11]  Escanaba Junior/Senior High School Athletic Handbook 2024–25, Escanaba Eskymos Athletics, https://escanabaareapublichighschool.bigteams.com/main/otherad?contentID=56263431 [perma.cc/37RL-RV6U].

least partially complies (Johnson Dep. 23) does not call ice hockey a boys' sport despite designating a number of sports as girls' sports.[12]  There is testimony by the athletic director at the time of the tryout that girls have always been able to try out for the hockey team.  (Wilson Dep. 20.)  Wilson also testified that there was a girl on the football team, which is also listed as a boys' sport in the school's athletic handbook.  (Wilson Dep. 12.)  A final consideration is hockey coach Andrew Johnson's strenuous denial that he excluded Allen from the team because of her sex: if the school district had a policy of not permitting girls to play hockey, then Johnson (or the district) could have validly invoked that policy to justify excluding Allen.  That the school district has largely refrained from standing on this argument militates against finding that girls are allowed onto the hockey team only if they are exempted from a boys-only policy.

As matters stand, whether the contact-sports exception applies to Allen's exclusion turns on disputed facts whose determination lies within the province of the jury.  Consequently, the Court proceeds on the assumption most favorable to Allen—that the school permits both sexes to try out for any sport and that the school cannot arbitrarily depart from that policy.

## II.    Live Claims

Only Allen's claims of disparate treatment under Title IX and the ELCRA (the first and fifth counts) and the attendant retaliation claim (portions of the second and sixth counts) are pending before the Court.  Assessing the viability of the disparate-treatment claim is complicated by the incongruity of a claim based on individual discrimination like Allen's with the mine run of cases involving Title IX violations by school athletics programs, which typically, and in keeping with the regulatory framework grafted onto the statute, concern an institution's program-wide

---

[12] Mich. High Sch. Athletic Ass'n, Handbook for 2023–2024 School Year 25 (2023), https://www.mhsaa.com /sites/default/files/Administrators/2024%20MHSAA%20Handbook%20Final%20-%20August%20Update.pdf [perma.cc/7ARE-K5MU].

practices.  Yet a slightly broader perspective reveals that Allen's claim is a perfect fit for the burden-shifting framework for assessing discrimination in the employment context.  Borrowing the *McDonnell Douglas* test accords with the statutory scheme, the decisions of other courts, and the principles underlying antidiscrimination law.   Under *McDonnell Douglas*, Allen has not presented enough evidence to submit her discrimination claim to a jury.  Allen does not convincingly explain why the conduct she accuses the hockey coach of can be imputed to the school district in the teeth of unambiguous precedent to the contrary.

Nor does the record substantiate Allen's retaliation claim.  No admissible evidence supports the claim that Allen reported bullying or harassment to any responsible school official, and there is no allegation that EAPS in any way retaliated against Allen after her mother's formal complaint.  In short, both of Allen's Title IX claims fail.

A.    Disparate Treatment

The parties naturally dispute which standard should apply to Plaintiff's claims if they are not found barred by the contact-sports exception.  The school district, correctly noting that the Sixth Circuit has not fixed a framework for evaluating an individual's claim of sex discrimination in education, proposes borrowing the Title VII burden-shifting test, but then it grafts onto it, with no support, the unrelated "deliberate indifference" test applied in some Title IX contexts.  Allen, by contrast, latches onto language in decisions applying the Title IX regulations to school athletics programs that states that schools must offer "equal athletic opportunities" without explaining how that framework applies to this case or addressing the obvious differences between a claim alleging schoolwide disparate treatment and disparate treatment of one person—a distinction critical to the Title IX regulations she relies on.  The Court finds that the burden-shifting framework, without the school district's gratuitous additions, is the best standard for evaluating Allen's claim.

1.    *Equal Treatment*

Allen does not explicate her theory of Title IX liability with any clarity.  She correctly recites the basic principle that schools must provide "equal athletic opportunity for members of both sexes," 34 C.F.R. § 106.41(c), but her construal of what that requires is at odds with the applicable regulatory framework and the cases she herself cites.  Briefly summarized, her position is as follows: Allen was entitled to try out for the hockey team, she was not allowed to try out because of her sex, not letting her try out because of her sex was disparate treatment, that treatment was so disparate that it denied her "equality of athletic opportunity" and denying her equality of athletic opportunity violated Title IX.  (Resp. 18–19.)

While there is some room for doubt that this is the theory Allen meant to advance given her failure to tie this inferential chain to the Title IX regulations, what Allen describes as a claim founded on disparate treatment claim is coextensive with what is more commonly known as an "equal treatment" claim.  *See, e.g.*, *Pederson v. La. State Univ.*, 213 F.3d 858, 865 n.4 (5th Cir. 2000).  That at least is what is suggested by the case upon which she principally relies.  *T.W. ex rel. Clemons v. Shelby Cnty. Bd. of Educ.*, 818 F. App'x 453, 462 & n.9 (6th Cir. 2020) (citing *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012)).  Equal-treatment claims derive directly from the requirement set out in Title IX's implementing regulation that schools provide "equal athletic opportunity for members of both sexes," 34 C.F.R. § 106.41(c), and subsequent guidance interpreting that requirement, *see* Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71413, 71415 (Dec. 11, 1979).  HEW evaluates the "equivalence in . . . athletic benefits and opportunities," *id.*, called for by section 106.41(c) with reference to the nonexhaustive

list of factors set out in section 106.41(c)(2)–(10).[13]  These include "the provision of equipment and supplies," "opportunit[ies] to receive coaching and academic tutoring," and "publicity."

Allen's construal of the equal-treatment standard is incompatible with the regulations upon which it is founded because she ignores the critical fact that the Title IX regulations only require that athletic opportunities for both sexes *as a class* be made available by the funding recipient. The regulations do not set out a framework for evaluating individual claims of sex discrimination and are not intended to identify or remedy that discrimination.  In its 1979 policy interpretation, HEW explicitly stated that the purpose of the policy was to ensure that "women athletes, as a class, are receiving opportunities and benefits equal to those of male athletes" and that ensuring equal treatment for women as a class would avoid entangling it in an effort to "force universities to offer identical programs to men and women."  Title IX and Intercollegiate Athletics, 44 Fed. Reg. at 71421.

Additional evidence of this point is furnished by the regulatory preamble to the recent amendments to the Title IX regulations, which explains their class-wide orientation in detail.  The preamble notes that the Department of Education's longstanding interpretation of the statute has been that it allows excluding an individual student from a sex-segregated team "on the basis of their sex, even when doing so may impose on them more than de minimis harm, as long as students, regardless of sex, have an equal opportunity to access the recipient's athletic program as a whole." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33817 (Apr. 29, 2024).  The same rationale underpins

---

[13] As touched on briefly above, subsection (c)(1) lists as another factor for evaluating equality of athletic opportunity whether the finding recipient "effectively accommodates the interests and abilities of members of both sexes." Because Allen does not set out her claim as one for effective accommodation—a framework that according to the regulatory guidance is even more geared toward program structure than equal-treatment claims—this factor is not discussed here.  *See* Title IX and Intercollegiate Athletics, 44 Fed. Reg. at 71418; 1996 Clarification at 118.

the Department of Education's reading Title IX to mandate that equal athletic opportunities be afforded "at a program-wide level, rather than at an individual[ ]level." *Id.* This eminently sensible reading of section 106.41 shows why an equal-treatment standard deriving from interpretive rules intended to guide educational institutions aiming to bring their athletics programs in line with Title IX is a poor guide to assessing a claim pursuant to the statute's private right of action for discriminatory treatment.

Failing to attend to the program-wide orientation of the Title IX regulatory framework leads Allen down a mire of confusion. To begin, nowhere in her opposition does she attempt to show how excluding her from trying out for the hockey team resulted in a sport- or program-wide disparity in the treatment EAPS affords to male and female athletes. Nor could she, since the equal-treatment factors listed in section 106.41(c) all concern differences between the resources or opportunities available to men's teams and women's teams. *See Anders v. Cal. State Univ., Fresno*, No. 1:21-cv-179, 2021 WL 1564448, at *18 (E.D. Cal. Apr. 21, 2021) ("'[E]qual treatment' claims under Title IX generally require a showing of a program-wide imbalance in the allocation of benefits between sexes, or alternatively, 'substantial' disparities in the treatment afforded to comparable male and female teams.").

That is confirmed by numerous cases entertaining equal-treatment claims. For instance, in *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, the disparity at issue was seasonal scheduling that prevented two high-school girls' soccer teams from competing in statewide championships. 370 F.3d 275, 280 (2d Cir. 2004); *see* Title IX and Intercollegiate Athletics, 44 Fed. Reg. at 71416 (discussing "opportunities to engage in available pre-season and post-season competition" as point of evaluation in determining equal treatment based on scheduling); *see also Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676 (6th Cir. 2006) (affirming

finding of Title IX violation based on girls' sports being scheduled for disadvantageous seasons).

Examples based on the other factors can be multiplied, *see, e.g.*, *Daniels v. Sch. Bd. of Brevard Cnty.*, 985 F. Supp. 1458, 1462 (M.D. Fla. 1997) (unequal playing facilities), but it suffices to say that Allen does not cite a single case in which an alleged disparity in the tryout conditions of one girl who tried out for one sport raised a viable equal-treatment claim.

In fact, none of the cases Allen does cite supports her interpretation of Title IX. Allen relies on *Communities for Equity*, 459 F.3d 676, to establish the viability of her disparate-treatment claim. But the court there explicitly limited the scope of its holding to school actions that invoke sex classifications, and the holding as to Title IX was that policies that facially classify on the basis of sex, such as seasonal schedules for sex-segregated sports teams, can violate Title IX even in the absence of "discriminatory animus" so long as the classification renders the athletic opportunities available to one sex unequal to those given to another. *Id.* at 696. *Communities for Equity* says nothing about how discrimination contrary to a facially neutral policy, such as the Escanaba Eskys' apparent policy of allowing boys and girls to try out for the varsity hockey team, should be evaluated. The case is therefore not controlling.

Allen then invokes *T.W. ex rel. Clemons v. Shelby Cnty. Bd. of Educ.*, 818 F. App'x 453 (6th Cir. 2020), to support the proposition that requiring one sex to try out for a sex-segregated team—in that case, girls' tennis—while not requiring tryouts for the other sex's team may deny the sex that is required to try out equal athletic opportunities. *Clemons* may not have foreclosed that possibility, but the case squarely holds that a policy disadvantaging one student-athlete does not deny girls equal opportunities across the board: the *Clemons* plaintiff failed to establish a Title IX violation because she did not show that instituting different tryout policies for the girls' and

boys' tennis teams "negatively impacted girls' athletic opportunities . . . overall," even if it had a "negative impact" on the plaintiff "as an individual." *Id.* at 463.

So far from bolstering Allen's argument, then, *Clemons* undermines it.  Allen too fails to show that any EAPS policy "negatively impacted girls' athletic opportunities overall."  In fact, Allen's claim is even weaker than that of the *Clemons* plaintiff because she cannot point to a facially sex-based classification that is responsible for her exclusion from the team.  Her allegations instead refer to decisions made with her, and her alone, in mind.  The logic of her position requires her to *deny* that the school district discriminates against girls in general, because only on that basis can she point to the disparity between her exclusion from the hockey tryouts and the permission previously given to two other girls to try out (and join the team) (Resp. 18).  This is only the clearest illustration of why a framework designed to determine if a school or university's entire athletics program is giving student-athletes of one sex as a class equal athletic opportunities is a poor lens through which to assess the treatment of a single individual.

Finally, *Brooks v. State College Area School District*, 643 F. Supp. 3d 499 (M.D. Pa. 2022), does not salvage Allen's disparate-treatment framework.  The primary claim in *Brooks* was that the defendant school district was not effectively accommodating the plaintiff middle-school girl*s*' (in the plural) interest in playing co-ed, nonchecking hockey.  *See Brooks*, 643 F. Supp. 3d at 507–10; Motion for Temporary Restraining Order 22–24, *Brooks*, 643 F. Supp. 3d 499 (No. 4:22-cv-1335) (M.D. Pa. Aug. 29, 2022), ECF No. 3.  That claim tracks educational institutions' responsibility under 34 C.F.R. § 106.41(c)(1) to ensure that boys' and girls' athletic opportunities are not only materially equivalent in terms of benefits and resources but also equally responsive to girls' interests in playing particular sports at a level of competition corresponding to their abilities. *See* 1996 Clarification at 124–26; *see also Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 788 (8th

Cir. 2021) (emphasizing that the effective-accommodation prong concerns "participation opportunities").

Allen's claim resembles the one in *Brooks* because it is about access to sports opportunities rather than ensuring those opportunities are equally robust.  But Allen, unlike the *Brooks* plaintiffs, seeks access to an existing sport that only she (according to the substantiated facts in the record) among the school's girls was interested in playing.  Neither Title IX's implementing regulations nor HEW and the Department of Education's interpretations of those regulations characterize denying one girl the opportunity to play a sport as a failure to effectively accommodate the athletic interests of the entire female student body of an educational institution.  Just as with *Communities for Equity* and *Clemons*, *Brooks* does not support Allen's allegations of individualized rather than class-wide discrimination.  The Court now turns to the school district's proposed framework to determine if it fares any better.

### 2.    *Deliberate Indifference*

Although EAPS argues that Allen's claim should be assessed according to Title VII's burden-shifting framework, it confusingly attempts to infuse a requirement that an educational institution subject to Title IX be deliberately indifferent to a violation before liability will lie. There is no support for the school district's novel approach.

First, contrary to the school district's protests in its reply brief, Sixth Circuit authority has strongly suggested that the deliberate-indifference standard is limited to allegations of Title IX violations premised on sexual harassment.  In *Doe v. Miami University*, 882 F.3d 579 (6th Cir. 2018), the court unambiguously held that a claim premised on deliberate indifference must allege sexual harassment, *id.* at 591, and that holding was reiterated as settled law in another case decided the same year, *Doe v. Baum*, 903 F.3d 575, 588 (6th Cir. 2018).  The school district does not cite, let alone attempt to distinguish, either case.  The flurry of unpublished opinions and district-court

decisions EAPS points to cannot overcome the weight of two precedents binding on this Court. Since Allen does not allege that she was sexually harassed, *Miami University* and *Baum* are enough to render the deliberate-indifference test inapplicable here.

The more fundamental problem with the school district's position is that it is taken to resolve a difficulty that does not exist.  The school district argues that without the imposition of a deliberate-indifference requirement, educational institutions could be held liable for negligent or even "reckless" supervision of their employees, when liability under Title IX requires that the institution itself has acted improperly.  (Mot. 24.)  It goes on to argue that it would be illogical to require victims of sexual harassment to demonstrate deliberate indifference while not requiring the same of those alleging mere disparate treatment.

It is black-letter law that obligations incurred by state and local governments by virtue of their accepting federal money run only as to them, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981), and thus that an institution cannot be held vicariously liable for the conduct of its employees or students, *see Bose v. Bea*, 947 F.3d 983, 989–91 (6th Cir. 2020).  But that in no way means that deliberate indifference is the appropriate means for determining whether discriminatory conduct is attributable to the school district.  Unlike sexual harassment, which involves interactions between individuals that are invisible to school district authorities unless brought to their attention, decisions about a school's athletics program are typically made by individuals with the power to set policies.  Consider the typical example of a school cutting one of its girls' or women's teams without a comparable adjustment to the opportunities afforded to boys and men.  It cannot plausibly be said that the school district that made that decision did not know about it or did not take that decision intentionally.  Thus, in this sort of Title IX athletics case, there is no point in mandating that the authoritative representatives of the institution have been

deliberately indifferent to a Title IX violation to establish that the institution's violation was intentional.

There is admittedly some force to the argument that in an atypical Title IX case like this one, which involves alleged discrimination against a student by a school employee in contravention of apparent school policy, requiring a showing of deliberate indifference makes sense. After all, it might be said, this situation involves a decision not by the responsible officials of the school district itself but by a mere employee, and barring a girl from trying out for a team she is eligible to be on is not conduct that is likely to be visible to those officials.

But all this can be true without necessitating the awkward combination of tests that EAPS recommends adopting here. The solution to the difficulty the school district raises is to use the *McDonnell Douglas* framework to evaluate the conduct of the school district's responsible officials rather than its employees. The Court proceeds to apply the unadulterated test.

### 3.    McDonnell Douglas *Burden-Shifting*

When confronted with Title IX claims that do not fit within the contours of the regulatory regime, courts have often sought guidance from the tests developed for evaluating cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, which prohibits discrimination in employment. *See, e.g.*, *Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 350 (6th Cir. 2020); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001). Although the differences in context between employment and education must not be ignored, and may necessitate modulation of the Title VII framework when imported to Title IX, the congruences between the typical employment-discrimination claim, in which an employer is accused of harming an individual employee in some way because of the employee's having a protected characteristic, and Title IX athletics claims like the one at issue here renders Title VII jurisprudence a natural source of inspiration. Courts have for this reason

applied the burden-shifting framework to claims alleging discriminatory enforcement of school rules against athletes, *see Arceneaux v. Assumption Par. Sch. Bd.*, 733 F. App'x 175, 178–79 (5th Cir. 2018); *Radwan v. Manuel*, 55 F.4th 101, 130–32 (2d Cir. 2022), and has uncontroversially been extended to retaliation claims, *see, e.g.*, *Bose*, 947 F.3d at 987–88; *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016).

The burden-shifting framework has three phases. The plaintiff must first establish a prima facie claim of discrimination. The elements of that claim, stated generically, are membership in a protected class, denial of an advantage or imposition of a detriment, and disparate treatment of similarly situated persons who do not belong to the protected class. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003); *see also Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (four-part test for employee discipline). Articulating a prima facie case shifts the burden to the defendant to provide nondiscriminatory reasons for the disparate treatment. A defendant who satisfies that burden of production throws the onus back onto the plaintiff to prove that the defendant's justifications are mere pretext. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083–84 (6th Cir. 1994). The burden of persuasion at all events lies with the plaintiff, so merely proving that the defendant's proffered reasons are a sham does not compel the conclusion that the true reason for the adverse action was the plaintiff's belonging to the protected class, although such an inference is permissible. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–48 (2000). Absent an express legislative directive to the contrary, the plaintiff must establish, according to the standard concept of causation in tort law, that the adverse action would not have been taken but for the defendant's discriminatory reason. *Cf. Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (but-for causation required for retaliation claims under

Title VII).  *But see Doe v. Univ. of Ky.*, 111 F.4th 705, 723 n.7 (6th Cir. 2024) (declining to extend *Nassar* to retaliation claims under Title IX).

Considered in light of this framework, Allen has not presented enough evidence that she was treated unequally by the school district to survive summary judgment.  Allen does not even make out a prima facie case of discrimination, because the decision she complains about—not being permitted to try out—was made not by Defendant but by an employee with no policymaking authority.  It is elementary that educational institutions can only be held liable for their own conduct under Title IX's private right of action.  Here, Allen does not make the slightest effort to explain how Johnson's decisions can be imputed to the school district without imposing the vicarious liability that the cases categorically foreclose.  It is perhaps symptomatic that Allen's opposition brief repeatedly attributes to the school district actions that she says Johnson did just before.  In one blatantly contradictory passage she notes that "Johnson told Chloe there was no point in her trying out" (Resp. 21) and then in the very next paragraph says that "EAPS didn't ultimately even allow Chloe to prove herself at tryouts before rejecting her."  (Resp. 22.)  If that is not vicarious liability, then nothing is.

By contrast, Allen can point to no action taken by *the school district* that comes close to suggesting a discriminatory motive.  When Allen's mother complained to superintendent Coby Fletcher about Allen's and H.A.'s tryout travails, he ordered an investigation by an outside law firm the very same day.  A thorough investigation by the firm, which included interviews with all the individuals involved, revealed no grounds for finding that Johnson had violated any of the school district's policies.  (ECF No. 23-7 at 11–13.)  The school informed Allen and her family of this conclusion in mid-January, approximately six weeks after the investigation was launched.  (ECF No. 17-14.)  Not one of these decisions can credibly be described as adverse to Allen.  Nor

does Allen present evidence of the school district handling complaints about discrimination differently by boys any differently, let alone more favorably.

Even if the school district is taken to have endorsed Johnson's decision, it has presented a bevy of nondiscriminatory justifications for refusing to let Allen try out. The first and most persuasive is that Allen *was* permitted to try out: there is no dispute that Allen showed up on the first day of tryouts and was permitted to participate in the opening drills. (Resp. 5.) If Allen had not fallen ill, there is no reason to think Johnson or the school district would have prevented her from participating in all three days of the tryout. Certainly Allen has not presented any evidence to that effect. Equally persuasive is the fact that Allen does not appear to have been a skilled enough player to join a varsity hockey team, as attested to by both her former hockey coaches and Johnson himself. (Mot. 27; Reply 13.) The school district legitimately relied on its hockey coach's assessment of Allen's skills from his observations of her playing when she was on an under-fourteen team, at open skates in the preseason, and during the ten minutes she spent at the initial tryout. It was under no obligation to give Allen special treatment by letting her try out again. Moreover, Johnson was entitled to infer from Allen's handling of the entire tryout process that she lacked other qualities that successful athletes possess, such as resilience, discipline, and self-motivation. Leaving in the middle of tryouts without saying anything and then failing to coordinate a makeup date until after the next practice are both acts that are not likely to demonstrate athletic promise to a coach. (*See* Johnson Dep. 61.) Again, the school district was on solid grounds for not second-guessing the evaluation of the employee in the best position to know.

Finally, none of Johnson's reasons can be described as pretextual.[14]   Allen relies on Wilson's statement to the school district's internal investigators that he "surmised" that Johnson wanted to "avoid turmoil on the team" (ECF No. 23-7 at 5.) to prove that Johnson's real motivation for excluding her was acquiescence in the exclusionary mindset of the hockey players.  (Resp. 23, 28.)  But Allen does not prove that Johnson knew anything about the turmoil her presence on the team allegedly threatened to cause.  Johnson testified to the exact opposite.  (Johnson Dep. 99–100.)  Allen's argument that she told Johnson about the bullying in her text message to him (Resp. 24, 27) is belied by her testimony that she neither was bullied by the male hockey players nor reported being bullied to anyone at the school.  (Allen Dep. 63–65.)  Not only that, Allen does not even attempt to debunk Johnson's rationale based on her missing two scheduled tryouts not to offer her a third.  Johnson expressly stated that Allen's membership on the team was "an open question" before she failed to show up for what he thought was her makeup tryout.  (Johnson Dep. 69.)  Allen, by contrast, introduced no evidence that Johnson knew she could not attend the second tryout because she was sick.  (Allen Dep. 46.)  By all indications, Johnson believed Allen had missed two tryouts and concluded that she did not deserve a spot on the team.  Allen's characterization of this justification as pretextual is unpersuasive.  In sum, Allen's core Title IX claim fails at every step.

The same reasons that preclude finding that the school district violated Title IX by not allowing her to try out sink her ancillary claims based on Johnson's rejection of Allen's request to join the team as a practice player or student manager.  Allen introduced no evidence that the school district had any role in excluding her from those roles or that it was obliged to allow her to be

---

[14] Although the record hints at nondiscriminatory but unadvanced grounds that may have led the coach to deny the tryout opportunity (*see* Reply 15 & n.6; ECF No. 23-7, at 5), these are not considered here.

considered for them once her exclusion came to the school district's attention.   Assuming Johnson's conduct was adopted by the school district, Allen failed to rebut his testimony that a high-school senior would be of no value to the team as a practice player, a position that is intended for those the coach hopes to develop into varsity-caliber athletes for future seasons.  (*See* Johnson Dep. 79–80.)  As to the student-manager position, the three cases Allen relies on (Resp. 21 n.20) do not support her claim: they either reserve judgment on whether Title IX mirrors whatever protections Title VII confers for those applying to administrative positions, *see Summa v. Hofstra Univ.*, 708 F.3d 115, 131–32 (2d Cir. 2013), or explicitly state that Title IX is not at issue, *DiSalvio v. Lower Merion High Sch. Dist.*, 158 F. Supp. 2d 553, 556 n.3 (E.D. Pa. 2001), or do not address the matter at all, *Mercer v. Duke Univ.*, 181 F. Supp. 2d 525, 532 (M.D.N.C. 2001).  Allen's derivative claims therefore fail regardless of whether Johnson's conduct can be imputed to EAPS.

With none of the facts underpinning Allen's Title IX claim being in genuine dispute, the Court concludes that the Escanaba Area Public Schools did not violate against Allen and for that reason that the school district is entitled to summary judgment.  This conclusion entails that summary judgment is also granted on Allen's parallel state-law claim under the Elliot-Larsen Civil Rights Act.

B.    Retaliation

Retaliation against those who complain of sex discrimination is itself a form of sex discrimination violative of Title IX.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176–77 (2005).  The parties agree that Title IX retaliation claims are evaluated using the burden-shifting framework.  Applying that test, the Court finds that Allen's retaliation claim fails as a matter of law.  A prima facie case of retaliation is premised on the alleged victim (1) engaging in a protected activity and (2) suffering a material adverse school-related action (3) at the hands of an educational institution that knew about the protected activity (4) as a result.  *Univ. of Ky.*, 111 F.4th at 716.

There is no basis for finding any of these elements satisfied, so Allen's retaliation claim does not get past the first step of the burden-shifting framework.

Here too Allen's claim fails primarily because the conduct she complains about—"withdr[awal]" of her makeup tryout after sending a text message to Coach Johnson and her exclusion from a celebration of seniors on the hockey team—was undertaken by Johnson, not the school district.  Allen presents no evidence that the school district's responsible officials were involved in those decisions.  Nor could she, since nothing in the record indicates that the school district even knew about those actions before Sandra Allen's complaint to the superintendent in December 2022.

Assuming Johnson's conduct can be ascribed to the school district, Allen still fails to make out a prima facie case because she cannot point to any materially adverse action taken against her. As discussed in connection with Allen's equal-treatment claim, Allen explicitly testified that her message to Johnson about the hurtful treatment she has experienced from boys in the past was not connected to any bullying at Escanaba High School.  Thus, that message does not constitute protected conduct, and any action taken as a result of it was not "adverse" in the Title IX sense. As for refusing to let Allen participate in the Eskymos' "Senior Night," that is not an adverse action for the simple reason that Allen cannot have had a reasonable expectation that she would be allowed to join a celebration of the graduating members of a team to which she did not belong. "Excluding" Allen from Senior Night was a mere corollary of excluding her from (the possibility of trying out for) the team.  And Allen introduced no evidence that exclusion from Senior Night would have deterred a high schooler of ordinary mental mettle from engaging in protected activity. So the adverse-action element is not satisfied.

Finally, it follows from the absence of protected activity and adverse action that no possible connection between those two elements can be established.  That is enough to find that Allen fails to make out her prima facie case and excuse going through the remainder of the burden-shifting test.  The school district is entitled to summary judgment on Allen's retaliation claim.

### III.    Abandoned Claims

Having resolved all of Allen's live claims against her, the Court must address the dismissal of some of the parties and claims named in the complaint that Allen's opposition brief purports to accomplish.  Allen represents that H.A. is no longer pursuing any of his claims and that all claims against the Escanaba Area Public School Board are also abandoned.  Allen further states that she is dropping her equal-protection and due-process claims under the Constitution and the ELCRA, as well as her state FOIA claim.

Allen's representation that she does not object to dismissal of the claims referenced in the opposition brief can be interpreted either as an attempted withdrawal or an explicit abandonment.  Abandoning a claim implies that the nonmovant has "failed to meet [their] Rule 56 burden."  *Clark v. City of Dublin*, 178 F. App'x 522, 525 (6th Cir. 2006); *see Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).  Rule 56 sets out the options available to a court when a party "fails to properly address another party's assertion of fact."  Fed. R. Civ. P. 56(e).  A fact not properly addressed can be considered "undisputed for purposes of the motion," Fed. R. 56(e)(2); this in turn permits granting summary judgment if warranted by the motion, the supporting materials, and "the facts considered undisputed."  Fed. R. 56(e)(3).

Given the advanced procedural posture in this case, the Court elects to treat Allen's claims as abandoned instead of permitting their withdrawal through constructive amendment, *see Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 687 (9th Cir. 2005).  In *Szoke v. UPS*, 398 F. App'x 145 (6th Cir. 2010), the Sixth Circuit held that amending a complaint to "add a new

defendant" and "change [the plaintiffs'] legal argument" while a summary judgment motion was pending prejudiced both the actual and the prospective defendant by denying them notice of the claims they were defending. *Id.* at 153. The issue here is somewhat different, in that the lack of notice to the school district of what claims Allen intended to press to the hilt caused it to waste resources on presenting arguments against claims that would soon be dropped. In both cases, however, a late change in course by one party created a risk of prejudice. Dismissal of Allen's unpressed claims on their merits is appropriate recompense for the prejudice the school district has suffered.

EAPS's motion for summary judgment (ECF No. 17) is **GRANTED**. A separate order and judgment consistent with this Opinion will issue.

Dated: May 6, 2025                    /s/ Hala Y. Jarbou
                                      HALA Y. JARBOU
                                      CHIEF UNITED STATES DISTRICT JUDGE